UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ] | |
| | ] | |
| v. | ] | No. 20-CR-7-01-LM |
| | ] | |
| HEIDI COMPOS | ] | |
| | ] | |

**SENTENCING MEMORANDUM AND REQUEST FOR A DOWNWARD VARIANCE**

The defendant, Heidi Compos, by and through counsel, Eric Wolpin, hereby files this sentencing memorandum respectfully asking that the Court sentence her to time served and three years of supervised release. This proposed sentence is no greater than necessary to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2) for the reasons provided below.

**I.      Introduction and sentencing request.**

Heidi developed an opiate addiction in her forties. After the death of her only child in 2019, Heidi used escalating amounts of fentanyl to end her life. Her arrest on this charge kept her alive. As she explained to the detective upon her arrest three years ago, she was "relieved" that she has been caught and hoped her arrest would give her "her life back."[1] During her incarceration and the years of treatment and supervision that followed her arrest, Heidi resurrected a life that had been long hidden. As described in greater detail below, Heidi completed a month-long residential treatment program, transitioned to a six-month long residential transitional living program, and now lives independently while sober and working full

---

[1] Report of Keene Det. A. Lippincott, Discovery at p.43.

1

time. She takes pride in her accomplishments and the family relationships that she has restored. She has an unwavering commitment to remaining to sober from opiates. A sentence of further incarceration would be counterproductive for society and for Heidi considering her progress during the last three years. A sentence of time served with supervision is no greater than necessary to achieve the goals of sentencing.

## II. Heidi struggled with addiction following the trauma of past violence and the grief of losing her mother, sibling, and child.

Heidi grew up in Cheshire County, New Hampshire and Cape Cod, Massachusetts. She lived in and around Keene, New Hampshire as an adult before relocating to Manchester following her 2020 release. Alcohol misuse runs through both branches of Heidi's family. As a child, she witnessed addiction's power to shape relationships in her nuclear and extended families. Her father, now in his seventies, has been sober for more than two decades and remains her closest support. While mired in addiction in the late 2010's, Heidi lost her father's trust. Since her release in this case, Heidi has worked hard to regain his trust as she has progressed through treatment and remained sober and working. Retaining the respect and pride of her father has been Heidi's primary motivator for achieving and maintaining sobriety.

Heidi planned to enlist in the military after high school. Her plans changed when, much to her family's dismay, she became pregnant as a teen. Although her pregnancy created friction, the arrival of a young person in need of love and care brought the family together. Heidi remained with her parents for years after her son's birth. When she left home, she landed a few houses down the street. Heidi abandoned high school and her plans to join the Air Force, and she began working to support her son. She raised her son, Josh, as a single parent with the help of her extended family.

Heidi's early adult life was hard. As noted in her mental health treatment records, Heidi was the victim of severe and repeated domestic violence as a young

adult. The following is an excerpt from her records:

> hx domestic violence. When Heidi was in her early 20s and a new mom, her boyfriend at the time was physically and sexually abusive: "When he didn't get his way he took it." The abuse went on for years. She left after they had been dating 8 years, and he tried to kill her by slitting her throat. Heidi pointed out the scar during the assessment. Asked whether she had any intrusive memories stemming from the abuse, she stated: "It made me stronger." She is not interested in dating because she doesn't want to be harmed again.

Heidi nonetheless moved forward. She followed her mother into factory work before settling in as the manager of a fast-food restaurant. She worked this stressful and low paying job for a decade. Heidi eventually left in search of work with more family-friendly hours.

Heidi's fondest memories of parenthood involve attending sporting events. Josh, like Heidi's father[2], was a strong athlete. Josh's interest in athletics is evident from the pictures below that friends and family attached to his 2019 online obituary[3]:



While Josh was growing up, Heidi worked hard and lived a sober life. She occasionally smoked marijuana but was not addicted to THC. She avoided alcohol after seeing its impact on her family and stayed away from hard drugs.

---

[2] A google search turns up online references to Heidi's father's 1961 individual New Hampshire state championship in cross-country while competing for Keene High School. *See* http://www.nhiaa.org/ckfinder/userfiles/files/CHAMP%20Boys%20XC%20Indv%202020.pdf.
[3] https://www.dignitymemorial.com/obituaries/keene-nh/joshua-compos-8863552.

Heidi's mental health, however, was less stable. A pair of deaths among her tight-knit family caused Heidi's mental health to falter. At twenty-nine years old (1997), Heidi's mother died of heart failure. Her mother and father were middle school sweethearts, and her mother's death emotionally devastated the family. Heidi struggled with depression. Her mental health struggles were further exacerbated by the death of her brother in a car accident six years later. Heidi and her brother were near in age and the two bonded over shared experiences. Heidi's depression worsened and notes from a December 10, 2003, visit with a therapist indicate that her "function is significantly impaired" in relation to "depression associated with multiple losses over the last few years."[4] Her struggles are well-summarized by a doctor's note from that visit:

> The patient reports that her mood began deteriorating over the last 5 years subsequent to the death of her mother from congestive heart failure. She reports "muttling along" since that time. Then her brother was killed in a motor vehicle accident in September and the patient's mood has profoundly deteriorated since then. Most of our time was spent discussing the relationship with her brother and the profound sense of a loss that she has. They were extremely close. Somewhat additional stress at this time that the patient does some caretaking responsibilities for a grandparent. The patient reports that she did have some counseling subsequent to her mother's death. She made some effort recently to reestablish counseling but did not do so due to financial limitations.

Soon after her brother's death, personal medical issues compounded Heidi's depression. In 2006, a surgery and subsequent injury caused permanent nerve pain, diagnosed as complex regional pain syndrome (CRPS), in her legs and feet. Heidi has used a number of pain-relieving treatments, including repeated nerve blocks, the latest in 2013, in an attempt to manage her pain. Heidi continues to struggle with CRPS,[5] particularly as she works on her feet outdoors, and utilizes non-opioid prescription medications intended to relieve nerve pain. For a time on supervision, Heidi used marijuana and CBD products to alleviate pain that worsened with her

---

[4] Heidi's Cheshire Medical Center records cover 700 pages and stretch from 1995 to October 2019.
[5] Amoskeag Health (Manchester) records from February and March 2002 note that Heidi was prescribed multiple drugs for "Complex Regional Pain Syndrome," and "severe foot pain" that was consistent with "peripheral neuropathy" with a "vascular component."

4

physically demanding job. With the help of counseling with LADC Robert Lang and a stubborn commitment, Heidi has now abstained from marijuana for six months. Her most recent negative-THC screen was on October 3, 2022.

Although Heidi struggled with mental and physical problems in her thirties, illicit drug use and addiction did not come into play until Heidi reached her forties. Her criminal record reflects this history. Heidi had a handful of cases in 1997 and 1998, around the time of her mom's death. PSR ¶¶ 47-49. She had no arrests during the thirteen years that followed. *See* PSR ¶ 50 (marijuana possession offense from 2010). In 2013, at forty-four years old, a then-boyfriend introduced her to snorting opioids. She quickly developed an addition. In 2016, at forty-nine years old, Heidi overdosed. As documented in notes from her October 2016 hospital visit, Heidi explained that "she is very disappointed in the fact that she overdosed [and] reports having more guilt now than she ever has." Heidi was up and down with her ability to remain sober. At a point when things were going well, she noted to her medical providers that she was "proud of the fact that she is no longer using heroin . . . and she is committed to being drug-free." Although Heidi participated in drug treatment during that time, including counseling and time at a sober house, she struggled to establish long term sobriety.

In 2019, Heidi's use peaked after her son died of an overdose at thirty-three years old. Heidi began using greater and greater amounts of heroin to drown her pain. She hoped to overdose. She explained to Counsel that she has "never been this broken in my whole life" as she was after her son's death. Her son's passing continues to be at the front of Heidi's mind. Her belief that her son would be proud of her sobriety is an important motivator to her remaining sober.

III. **Heidi achieved stability and sobriety from opioids over the last two and half years through extensive treatment, rehabilitation, and reflection.**

Heidi was initially charged in state court and was detained at the Cheshire County House of Corrections (CCHOC) beginning in November 2019. While at CCHOC, Heidi participated in MRT. Once charges were brought in this Court in January 2020, Heidi was moved to the Merrimack County House of Corrections. In April 2020, after four-and-a-half months in jail, Heidi was released to a twenty-eight-day residential treatment program. In May 2020, she finished the program and moved through a series of programs run by Families in Transition (FIT) in Manchester.

In late May 2020, Heidi moved into FIT's Transitional Living Program (TLP). She remained there for six months. Heidi began Intensive Outpatient Treatment (IOP) within a week of arriving at TLP. She completed IOP in July 2020 and stepped down into outpatient group counseling. As noted in the attached letter, Heidi "consistently attended outpatient counseling and case management sessions" and "[r]andom urine screens [were] conducted as part of treatment all [of] which were appropriate during her time residing at TLP." Exhibit A. The TLP program had numerous house-requirements, including attending self-help meetings, house meetings, random urine screens, etc., with which Heidi was compliant. While at TLP, she had multiple therapists, case managers, house managers and her daily life was highly structured and focused heavily on her treatment needs.

In November 2020, Heidi moved out of TLP and in with a friend. As noted in the attached, Heidi remained connected with FIT after leaving TLP, participating at various times in group treatment and individual case management sessions. Her most recent engagement with FIT was from February 2022 to July 2022 where she participated in outpatient groups. Heidi has also participated in individual counseling with Robert Lang, MSW, MLADC, LCS of Reentry Resources Counseling. Mr. Lang serves as the LADC for the LASER program. Heidi finds her meeting with Mr. Lang productive and intends to continue seeing him for additional counseling. Sarah

Bernier, LICSW, MLADC, Heidi's primary contact during her two years of services with FIT, described Heidi's participation in treatment as follows:

> Ms. Compos has been engaged, participatory, consistent and collaborative in her treatment at Willows. She is reflective and self-aware of her past journey and how she can continue to work on her own goals. Ms. Compos has completed her treatment goals at this time, and has the awareness should she need to reach out again for additional support. . . . Ms. Compos has completed both intensive outpatient programming, transitional living, and outpatient services with Willows Substance Use Treatment Center.

Exhibit A at 1-2.

In addition to receiving substance use disorder treatment through FIT, Heidi engaged with mental health services through the Mental Health Center of Manchester. Heidi has participated in treatment and counseling with the Mental Health Center of Manchester for the past two years. Although, admittedly, page volume is an imperfect proxy for effort, her treatment records are several hundred pages in length and demonstrate an extended commitment to her rehabilitation. Heidi's counselors addressed persistent issues of anxiety, depression, and PTSD. Throughout her pretrial release, Heidi has sought to process the grief and loss that followed her son's death as evidenced by an October 4, 2021, progress note from her meeting with her mental health clinician:

> [Heidi] owns distress due to ongoing depression. "On days off I just sit in my room with the blinds closed." [Heidi] says she continues to have a voice in her head that tells her she would be better off dead because her son is no longer with her. . . . [Heidi] says she continues to miss her son and mourns that he is not able to see her now and the progress that she has made. . . . [Heidi] says that drug addiction is a part of her but separate from her and that she find this a helpful way to understand it.

Although Heidi has had bouts of depression and grief while on pretrial supervision, Heidi has not had a single relapse with opioids while on pretrial release for the past

two and one half years.

When Heidi first left the jail and entered treatment, her sole focus was on her sobriety and mental health. She did not work while in residential treatment. Instead, she attended meetings and counseling sessions at the near-equivalency of a full time job. Once her treatment and housing were well in hand, Heidi started working. She began at a dollar store and worked as a construction site "flagger" on the side. She preferred the flagging work—directing traffic at construction sites throughout New Hampshire—and now works in that field full time. Heidi's job is physically taxing, requiring Heidi to remain on her feet for hours at a time in the elements, unprotected, on oppressively hot days and cold, rainy days. Despite wearing as many as a half-dozen layers to keep warm on chilly days, Heidi enjoys her job immensely. She developed relationships with her bosses and has received a series of raises. Counsel received a call from a manager of a construction company with whom she regularly works who extolled Heidi's work ethic on the job. Heidi used her earnings to restore her driver's license and purchase a used car.

Following her arrest, Heidi transitioned from jail to residential treatment to transitional living to independent living. She has worked hard to reestablish her independence, sobriety, and self-worth. Heidi's life has a normalcy and peace that she lacked when opiate addiction dominated her life. She is committed to continuing in this direction.

### IV. Heidi immediately admitted to her offense conduct and has demonstrated through her progress on pretrial release that she will not return to opioid use or distribution to support that use.

Heidi used opiates for years before she began distributing fentanyl in 2019 to support her own addiction. The Keene Police Department learned that she was involved in distributing when she showed them her phone and police saw indicators of

distribution. Through a confidential informant, law enforcement made a series of one-to-two-gram purchases of fentanyl and cocaine from Heidi and Jason Martin. In late 2019, Keene Police Department executed a search warrant for Heidi's residence. She kept a bedroom with Jason in a dilapidated home shared with several others. A search of Jason and Heidi's room led to the discovery of approximately twenty fingers of fentanyl, money, marijuana, and personal use drugs and drug paraphernalia. Heidi admitted to police that had been selling since the previous month. She immediately took responsibility for her conduct and expressed "relie[f]" at being arrested. Heidi credits law enforcement's intervention with saving her life and has thanked the detective who arrested her.

### V. After thoughtful deliberation, Heidi concluded that she would be best served by supervision through standard supervised release rather than the LASER program.

Before addressing Heidi's proposed sentence, the Defense addresses Heidi's decision to move forward with sentencing despite her acceptance to LASER. Counsel first proposed Heidi for LASER thirty months ago, via a March 25, 2020, letter to the Government. Heidi began residential treatment several weeks later. At the end of 2021, after reflection and consideration, the Government agreed to support Heidi's LASER candidacy. She entered a plea in December of that year. At that time, Heidi had been sober from opioids for more than two years and had completed two residential treatment programs totaling more than seven months.

Heidi had physical health problems while on pretrial release, including a continuing struggle with chronic pain and unexplained weight loss. Heidi used marijuana to address her physical symptoms and long-standing mental health problems, particularly her PTSD. LASER would not accept her while she was using marijuana and her entry into LASER was delayed while she received counseling with

the program's LADC, Robert Lang, to address her marijuana use. Heidi worked with LADC Lang for much of this year. In March 2022, Heidi stopped using marijuana. She has been one-hundred percent abstinent from marijuana for six months. This removed the obstacle to her participation in LASER.

Although the marijuana use concern was addressed, LADC Lang expressed concerns about Heidi's participation in LASER. Among those concerns was whether Heidi's mental health diagnoses would impede her progress in the program. As relayed to Counsel by Kevin Lavigne of United States Probation in a June 2, 2022, email, Bob Lang expressed his opinion that he "think[s Heidi's] psychiatric issues: Bipolar, Borderline Personality and probably PTSD will not allow her to succeed in LASER. She probably needs an alternative plan if that is a consideration." Thus, although LASER was willing to work with Heidi, there were concerns about Heidi's suitability for the program. As noted above, Heidi continues to speak with LADC Lang in an individual, non-LASER capacity.

This summer, Heidi took another look at LASER's expectations. She conferred with Counsel and her LADC about the program. In August, she came to the courthouse and observed a LASER session. This was her second such observation. LASER is a twelve-to-eighteen-month that requires a participant move through four phases of sobriety, treatment, and personal development. https://www.nhd.uscourts.gov/laser-docket. While on pretrial release, Heidi has focused on addressing her addiction, steadying her mental health, and increasing stabilizing factors, including work, housing, family relationships, friendships, and her physical health. She has done so for *twice the length of time* of LASER while under pretrial supervision. She has done so with significant supports in the community. *See* Exhibit A (letter from treatment provider working with her for more than two years); Exhibit B (Defense Investigator's memorandum of interview with Heidi's father). She currently participates in outpatient counseling with the LASER program's LADC.

Reviewing the program's expectations ahead of her observation, Heidi saw a sequence of steps, many of which had already met. For example, the phases include requirements to obtain a Mental Health Assessment (done), attend self-help meetings (done), maintain sobriety for thirty or ninety consecutive days (done), obtain a GED (done), establish a primary care physician (done), develop a sober support network (done), maintain employment (done), develop a monthly budget (done), and engage in positive leisure activities (done). While observing the give and take of LASER participants with the Court, Heidi saw a program that would have benefited her a year or two years ago.

After deliberation and consideration, Heidi concluded that LASER's structure and oversight did not meet her current needs. She is not being lazy nor is she dismissive of the program's value. She is well aware that agreeing to LASER would have provided a more certain path to a non-incarcerative sentence. But, Heidi finds herself today where she hoped to have been had she done LASER. She has met many of the program's targets. Heidi's conclusion is consistent with research that intensive supervision does not benefit, and in fact can be counterproductive, for supervisees who have lower-intensity needs.[6] At this stage in Heidi's progress with her addiction, employment, housing, and mental health, she has lower-intensity needs. She has not used opioids for years. She is abstinent from marijuana. She has a car. She works. She has positive family relationships and friendships. She has been in the community for thirty months without being charged with a new criminal offense. Taking a "spot" in LASER that could serve someone with higher needs is counterproductive for Heidi and for the program.

The LASER program seeks to develop **L**aw **A**biding **S**ober **E**mployed and

---

[6] The Pew Charitable Trusts, *Policy Reforms Can Strengthen Community Supervision: A framework to improve probation and parole*, Apr. 23, 2020 *available at* https://www.pewtrusts.org/en/research-and-analysis/reports/2020/04/policy-reforms-can-strengthen-community-supervision (last visited Sept. 7, 2022) ("research indicates that subjecting low risk individuals to intensive supervision or treatment leads to worse outcomes than no intervention.").

Responsible citizens over twelve to eighteen months of programming. Heidi has developed into that person during two-and-a-half years of pretrial supervision and extensive treatment. Continuing with supervised release rather than participating in LASER best suits Heidi's rehabilitation and best achieves the goals of sentencing.

**VI. Heidi objects to the application of a two-point deadly weapon enhancement and requests downward departures to reflect her significant mental health history and the overstatement of her criminal history as a result of simple marijuana possession offenses.**

The Defendant objects to the application of a two-point enhancement under USSG § 2D1.1(b)(1) for the presence of a bb gun in Heidi's residence. The Defense specifically raises departures under USSG § 5H1.3 and USSG § 4A1.3(b)(1).

**A. USSG § 2D1.1(b)(1) Objection**

The Defense objects to the application of a two-point enhancement under USSG § 2D1.1(b)(1) for the presence of a bb gun in Heidi's residence. Law enforcement searched Heidi's room per a court issued search warrant. PSR ¶ 23 Keene Police Detective Steven Lamears' supplemental narrative (Discovery 19R472_RPT_00053) itemizes the things seized. The reports indicates that a bb gun was found in a white dresser in Heidi's room. No heroin or fentanyl were located in the dresser. The only controlled substance in the dresser was suboxone, a prescribed substance unrelated to the offense conduct. No reports from confidential informants indicate that Heidi possessed or displayed a firearm in relation to drug distribution. There is insufficient evidence to develop a nexus between distribution and possession of the bb gun to justify application of USSG § 2D1.1(b)(1)'s two-point enhancement.

**B. USSG § 5H1.3 Departure**

Heidi requests that the Court depart downward under USSG § 5H1.3 in light of

her significant history of mental health conditions. As noted above, she has been the subject of severe partner violence and family traumas. She has been diagnosed with "posttraumatic stress disorder with panic attacks." USSG § 5H1.3 ("Mental and Emotional Conditions") states that "mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." It also notes that "a downward departure may be appropriate to accomplish a specific treatment purpose. *Id.; see also United States v. Maldonado-Montalvo*, 356 F.3d 65 (1st Cir. 2003) (requiring the court decide whether the defendant's mental condition is extraordinary or atypical. If imprisonment would case "irreparable harm," the availability of prison treatment prison programs does not preclude application of this departure.). Heidi has engaged in continuing mental health treatment since her release. As noted above, LASER's LADC suspected Heidi's mental health diagnosis were of sufficient significance to impair her ability to participate in that alternative sentencing program. A downward departure is warranted under USSG § 5H1.3.

**C. USSG § 4A1.3(b)(1) Departure**

Heidi requests that the Court depart downward under USSG § 4A1.3(b)(1) as her "criminal history category substantially overrepresents the seriousness of her criminal history" and the "likelihood that [she] will commit other crimes." Heidi's criminal history includes two convictions for possession of marijuana. *See* PSR ¶ 50 (2010 conviction for possession of marijuana where her purse contained a "pipe containing burnt marijuana residue and a film canister that contained what appeared to be marijuana residue"); PSR ¶ 59 (2016 conviction for possession of marijuana where Heidi "was holding a pipe that continued marijuana"). These two convictions contribute two points toward her criminal history.

Per NH RSA 651:5-b, these state simple marijuana possession charges are annullable. Counsel worked with Heidi to submit the necessary annulment paperwork. The state court declined to fully waive the filing fees and the annulment matter has not yet moved forward. However, once the issue of filing fees is resolved, the law provides that these motions are to be granted as a matter of course. *See* RSA 651:5-b ("[T]he court shall grant the petition unless the prosecutor has proven that the amount of marijuana exceeded 3/4 of an ounce."). Likewise, federal convictions of this kind were recently granted a blanket pardon. *See*, The White House, *A Proclamation on Granting Pardon for the Offense of Simple Possession of Marijuana*, Oct. 6, 2022, ("Acting pursuant to the grant of authority in Article II, Section 2, of the Constitution of the United States, I, Joseph R. Biden Jr., do hereby grant a full, complete, and unconditional pardon to (1) all current United States citizens and lawful permanent residents who committed the offense of simple possession of marijuana . . ." under federal law).[7] As these charges are annullable as a matter of course, Heidi should have two fewer criminal history points (eight) and fall within Category IV. A departure under § 4A1.3(b)(1) down to Category IV to reflect that anticipated outcome would lead to an accurate reflection of her criminal history.

## VII. Conclusion: The goals of sentencing set forth in 18 U.S.C § 3553(a)(2) are not met by Heidi's further incarceration.

The Court must balance several sentencing purposes, including punishment, deterrence, incapacitation, and rehabilitation. In this case, the goals of sentencing are best met with a sentence of supervision without re-incarceration. As discussed above, Heidi's prompt acceptance of responsibility, her challenging history with domestic violence, family tragedy, and mental health diagnoses, her health, and her success with sobriety, housing, and employment while on pretrial supervision, indicate that

---

[7] Available at https://www.whitehouse.gov/briefing-room/presidential-actions/2022/10/06/granting-pardon-for-the-offense-of-simple-possession-of-marijuana/ (last visited October 11, 2022).

the best manner to protect the public and Heidi is for her to be sober, productive, and supervised.

Heidi has shown a commitment to and capacity for sobriety during the present period of pretrial supervision. She completed seven months of residential treatment where she worked on her sobriety and connected with an outside mental health agency. She was released more than two years ago and has not had a single relapse with opioids in the meantime. She continued to use marijuana for a time but has abstained from that for the last six months. She connected with medical providers to take care of her mental and physical health. She has regained the support of her family and has reached a level of sustainable success that seemed unachievable when she was actively using.

Heidi spent four and a half months in jail. She lived in congregate settings for an additional seven months. Although treatment facilities may be less overtly punitive than federal prison, they are restrictive, limit personal choice, and restrict contact with family. These programs serve rehabilitative, restrictive, and integrative purposes similar to a federal halfway house. To detour Heidi from her current course to serve time at a federal prison and then a BOP halfway house does not advance society or Heidi's interest. It is not certain that she would leave the halfway house and enter supervision with the same tools, supports, and momentum that are in place today to continue her present success on supervision. Any outstanding need for punishment can be achieved not by further incarceration, but through restrictions of liberty that come with supervision and the possibility of future incarceration for noncompliance.

Here, Heidi's extended pretrial time in the community provides guidance as to the need for incapacitation and further specific deterrence. Heidi committed these offenses at a time when she did not value her life. As her father describes in the attached letter, Heidi has turned herself around and now takes great pride in her life

and successes. The Court need not impose further incarceration to deter or incapacitate her where she has a thirty-month track record of not recidivating while on supervision. As to the goals of rehabilitation, to Heidi's credit, that hard work has been ongoing for several years. Her time on supervised release will continue to demand she keep up with her sobriety and treatment best meets the rehabilitative goals of sentencing.

Additionally, although not a dispositive factor in determining Heidi's sentence, the Defense urges the Court to consider that Heidi's codefendant, Jason Martin, received a time-served sentence for jointly participating in the same course of conduct. ECF Doc. 71 (Judgment imposing a sentence of time-served). Among the Court's statutorily set interests is imposing a sentence that "avoid[s] unwarranted disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. 3553(a)(6), and "promot[ing] respect for the law. 18 U.S.C. 3553(a)(2)(A). Although no two defendants are identically situated, these two defendants were distributing drugs together in 2019 while supporting an addiction and both developed a grounding in a sober, law-abiding lifestyle while on pretrial release. Providing a time served sentence in this case would avoid unwarranted sentencing disparities and promote respect for the law in light of the sentence the Court imposed in Mr. Martin's case.

Here, the statutory goals of sentencing are best met by Heidi's continued supervision. For the reasons noted above, a time served sentence with supervised release is appropriate under 18 U.S.C § 3553(a).

Respectfully submitted,

Dated: October 11, 2022

*/s/ Eric Wolpin*
Eric Wolpin
N.H. Bar #18372
Assistant Federal Public Defender

Eric_Wolpin @fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2022, the above document was served electronically upon all counsel of record through the CM/ECF filing system.

*/s/ Eric Wolpin*
Eric Wolpin